We'll hear argument this morning in Case 21-401, ZF Automotive US, Inc. v. Luxshare, Ltd. and the consolidated case. Mr. Martinez. Mr. Chief Justice, and may it please the Court, Section 1782's text, structure, and history make clear that district courts are not authorized to grant discovery for use in purely private foreign arbitrations. The key statutory language is the complete phrase, foreign tribunal. That phrase most naturally refers to government tribunals, just like the phrase foreign leader most naturally refers to government leaders. Ordinary and legal usage confirm that interpretation. So do nearby provisions using the same phrase, as well as this Court's decision in Intel. The history supports us, too. The Rules Commission drafted this statute under a direct command from Congress in the 1958 Act to promote interstate comedy and assist the judicial and quasi-judicial arms of foreign governments. The Commission, Senate, and House reports all show that the drafters chose the words foreign tribunal to achieve these government-focused objectives. Luxshare misreads the text and ignores the context. It can't identify a single person, not a lawmaker, judge, lawyer, scholar, anyone, who ever claimed 1782 covers private arbitrations, either in 1964 or for decades afterwards. Luxshare's approach would flood district courts with discovery applications, undermine the goals of arbitration, and inflict asymmetric harm on American companies and American businesses. Congress didn't intend these results. Below, Luxshare admitted that under the rules Luxshare itself agreed to, the German arbitrators in this case would refuse to order the discovery it's now seeking here. You should reject any interpretation of 1782 that encourages parties to run to U.S. courts to circumvent their agreements in this way. Congress did not force American judges to referee private discovery fights in purely private, non-governmental arbitrations abroad. I welcome the court's questions. And I'd like to start, perhaps, with the statutory text. Mr. Martinez, why isn't it natural to think of a foreign tribunal as one established under the laws of a foreign country? A tribunal in Italy, you know, its existence is, say, due to Italian corporate law or whatever, and enforceability of its judgments might well be particularly compelling in Italy. I don't know why it's necessarily referencing a governmental entity. Well, I think a couple of points on that, Your Honor. I think the complete phrase, foreign tribunal, that's sort of a common construction, adding the adjective foreign to a noun that has, you know, strong governmental connotations. We've given the examples in our brief of foreign leader, foreign flag, foreign law, foreign official. When people hear those sort of phrases using the word foreign with a noun like that, I think it most naturally conjures up the idea of an official, a flag, a leader of a government. And I think that's the sort of intuition, that's the common construction, and I think that common construction... Well, it might be because you don't think of private people as having their own flags. But tribunal, I mean, I understand your argument that it carries a governmental connotation, but I'm not sure that excludes any other tribunal. I mean, the arbitral bodies function as a tribunal. It's natural to refer to them in that way. And particularly when you add foreign, it seems to me that that means it's, you know, a private arbitrable body, tribunal, that happens to be located, set up in a foreign country in France. So a couple of points on that, Your Honor. I do think a phrase like foreign leader would not be sort of ordinarily used to refer to a non-governmental entity. You know, the captain of the Manchester United football team is foreign and is a leader, but is not a foreign leader.  But, you know, the tribunals are also adjudicatory bodies, and foreign carries significance in that it is set up in Italy. It's not like a gratuitous word that can only convey the notion of governmental. Well, I guess a couple of points. First of all, in ordinary usage, if you just look empirically, and this is the study that we, the usage study, the corpus linguistic study that we cite in our reply brief. What the study did was it sort of comprehensively looked at five different databases involving tens of thousands of documents, millions of words, and it historically... Yeah, I don't quite know what to make of that. That's something new. I mean, have we relied on that source before? Not this particular study, but you absolutely have used that same methodology before. I think the best example is the court's decision in Muscarello, where the court... Have I ever done that before? Have you ever done that? I think, if I recall correctly, Your Honor, I think you wrote the decision in AT&T versus FCC, which sort of similarly looked beyond dictionary definitions to kind of a couple of different what the academics would call a corpus, but the sort of body of U.S. judicial opinions, U.S. statutes. And I think it's a common way of trying to tease out the ordinary meaning, a survey ordinary usage. The court has never used the corpus linguistics database before. You know, the Sixth Circuit has, the Utah Supreme Court has, but this court has not done. I mean, Muscarello was a more informal survey, as was the chief's opinion in AT&T, correct? Right, and so I think what the corpus linguistics study here does is take that same methodology and make it more accurate and reliable by being more comprehensive, but I think it's the same general idea, and the idea is essentially if we're going to figure out what the ordinary meaning of language is, let's look to see how ordinary people use it in all sorts of different contexts. So I don't think it's methodologically new. I think it's just a little bit more scholarly, a little bit more reliable. They use Latin words, which maybe makes it a little scarier in some way, but I think it's the same basic idea. But Chief Justice, I do want to get back to your point about tribunal and foreign tribunal. I think that what's interesting is that if you look historically, that phrase as a unified whole is sort of has historically empirically been used to refer to government entities. I think you're right that if you took the word tribunal alone in ordinary speech, that would pose a somewhat different question, but if you look at the way Congress has used the word tribunal historically, at the time that this statute was passed in 1964, Congress had used tribunal many times in statutes. Every single time it had used the word tribunal to refer to a government entity, and in situations after 1964, I think there are a couple of examples where Congress used the phrase arbitral tribunal. I think what's notable is that it added the adjective arbitral because it wanted to signal that it was going beyond its standard sort of government-focused usage of tribunal to capture arbitral tribunal. Go ahead. Back then, arbitration was not as settled a practice as it is now, but now we just commonly refer to arbitral tribunals, right? And we don't think anything of it. I guess the idea that when you put foreign in front of something, all of a sudden it connotes government. I mean, you have some examples where it does. Foreign language doesn't connote government. If I say it's a foreign university, I may or may not be speaking of a government-run school. If I say it's a foreign city, all I mean is a city that happens to be in another country. I mean, it all depends, right? And I guess my broader question is, really, what can you take from this language? I mean, I'm all for being serious about language when there's something to be serious about, but I don't know what this language tells us. I think, let me move past the ordinary meaning, because I do think our sources do give you something just about that phrase, but I think that that's just one piece of the puzzle, because we have a bunch of other arguments based on the broader statutory context, the history, and the policy that Congress was trying to enact here that really, I think, reinforce our reading of the statutory language. Going to the broader statutory context, we've cited three neighboring provisions. The Practice or Procedure Clause in 1782, the State Department Middleman Provision in 1781, and the Judgment, Order, and Decree Language in 1696. We think none of those is 100% dispositive. It's not going to be a slam-dunk case winner for us on its own, but I think that constellation of provisions operating together, each one of them kind of favors our side and I think reinforces the point that here you are using the phrase foreign tribunal kind of like you would use the phrase foreign leader as opposed to foreign food. I think in addition to that, though, Your Honor, we can look to the history, and here you have history that is overwhelmingly, in my view, unbiased, but in my view, on our side. This statute was drafted by the Rules Commission, and the Rules Commission drafted the statute to implement a specific... Sorry, drafted the proposed language to implement the statutory directive in the 1958 Act. And that directive, which is on 14A of the Solicitor General's appendix, was to draft legislation that would improve assistance to foreign courts and quasi-judicial agencies with the purpose of enhancing cooperation between the United States and foreign countries. So look at the focus of that 58 Act and its directive. Quasi-judicial agencies, cooperation with foreign countries. The focus there is on aid to governmental adjudicators, not to private arbitrators. And so the Rules Commission, when it got this command from Congress, it sat down and it translated that command into the statutory language that would become 1782. And not only did it write the statute to implement the command, but it also wrote a 105-page report telling Congress and the world what it had done. And what does the report say? On page 17, it says, we are implementing the statutory command that appears in section 2 of the 1958 Act. So it links the language that it chose, the legislation that it drafted, to the specific directive that it was given by Congress. Quasi-judicial agencies, cooperation with foreign countries. Then, later in the report, on page 45, when it's discussing its choice of the phrase foreign tribunal, it specifically says we chose these words because we wanted to pick up something more than just foreign courts. We wanted to broaden it a little bit. And we wanted to broaden it to cover investigating magistrates, foreign administrative tribunals, and quasi-judicial agencies. All of those are government-focused. Quasi-judicial, by the way, I think the Halliburton Brief has the Black's Law Dictionary of quasi-judicial. That refers to government officials. So not only do you have the 1958 Act, but you have the Rules Commission Report, which chose words... I mean, these are experts, eight of the top experts on law and international law in the country. They were on this commission. They chose words to implement the statutory directive, which was limited to government-focused objectives. They put those words in the legislation. They issued a 105-page report telling everyone what they had done. Congress then took that report, put it... Or the committees took that report, explaining the language. They cut and pasted the explanation into the Senate report, into the House report. They then enacted the statute without change. And then this court comes along a number of years later, and when it's interpreting this statute in intel, methodologically, what does it do? It looks to the exact same historical sources that we're pointing to. The 1958 Act, the Rules Commission, the House report, the Senate report. And not only does it look to those sources, but it looks to the exact same points that we're making about the governmental objectives, the quasi-judicial agency goal of this statute. Thank you, Counsel. Justice Breyer? The language goes... It's true, they were thinking probably of government, but the language can be read more broadly, and unlike then, now, commercial arbitration is resolving lots and lots of matters that businesses used to bring before courts. And so what's the problem? Why not treat them the same way as these quasi-judicial etc. used to be treated? Purposes similar, language similar, nothing that says you can't. Why not? I think that the history and the language foreclose you from doing that, but even if we were just looking at the policy objectives, I think it would be very strange to think that Congress would have wanted to create the results that this statute creates on luxurious reading. No, you've read, as I've read, the amicus briefs, which have several ways of preventing this interpretation from getting out of hand. Probably the most important being intel modification, which would say don't order discovery unless the tribunal wants the discovery. Right, but that would... Justice Breyer, I know you dissented in intel and were more attuned to some of the challenges that the statute would pose, but I think that's at odds with this court's interpretation of the statute. No, I can look at that, but my question is a practical question. Sure. If the language allows it, like foreign language, not government, state arbitration tribunals, hmm, what about those? Well, government's involved. Well, so, you see, if you do take that approach, I want you to talk about that. Send what happens. Why is this so terrible? I think there are four problems, and I'll just do it quickly, cognizant of the time. One, I think it's going to overburden U.S. district courts and put U.S. district courts in a position of essentially meddling or playing a role in private proceedings abroad where there might not be a strong U.S. interest. I think it's notable that the government is on our side and I think recognizes that that's a kind of unusual place to put district courts. Number two, I do think it undermines the goals of arbitration because when parties sign up to arbitration, the reason they're often doing that is to opt for a more streamlined set of procedures that don't include the kind of burdensome discovery you see in litigation. So when you have a bunch of parties making a contract overseas, an arbitration contract, I think it would come as quite a surprise to them that they're suddenly triggering the potential for intrusive, burdensome, and time-consuming discovery proceedings that might happen in the United States. So I think it's contrary to the contract goals, contract-based goals of arbitration. Number three, I think that this statute asymmetrically disadvantages American citizens and American businesses. I think it's a bad policy consequence. I also think, though, that that provides a useful window into congressional intent. It seems very unlikely to me that Congress would have passed a statute that would have burdened whether they're U.S. third parties or whether they're U.S. parties. All right, on the burden, I've read that England, France, Spain, I think, and Germany, they all follow this approach or something like it, and they think that attracts business and it's good for their economy and it's good for their bar because people will come to their courts to settle commercial disputes or at least their arbitrations. Your Honor, I don't think that's... How am I wrong? Go ahead. I don't think that's right. First of all, if you look at the Born Treaties, those are the handful of counterexamples that allow anything even, like, arguably in the same ballpark as this. The majority of states go the other way. Even with respect to those states, though, the discovery that is potentially available to foreign arbitrations under the laws of those countries is completely different from what we're talking about here. In those countries, you can't get it before the arbitral panel is constituted. You can only get it with the permission of the arbitrator, and the actual discovery that's ordered is not, like, U.S. style, you know, give me all the documents, you know, all the e-mails using this term over this year period, but we're talking about very targeted. So no country in the world would grant this kind of request. And certainly, Luxshare and the amicus breach have not cited anything. I think the final sort of policy point, and this is really... And this builds on what I was just saying. I think... If Luxshare is right about what this statute means, it really puts the United States as an outlier with respect to its treatment of international arbitration. And I think comedy is really all about harmonizing, when possible, U.S. law with the law of other countries. And I just think it's very... It's anomalous. It's not a... It's not good policy, but it's also not a good approximation of what Congress was trying to get at with this statute, to think that it wanted to uniquely disadvantage American parties and make the United States an outlier on the international stage in this way. Justice Alito? Anything? Justice Sotomayor? Justice Gorsuch? Anything further? Two questions. First, the brief set up a divide between looking at the literal meaning of individual words versus the ordinary meaning of a phrase as a whole. Why should we go with the ordinary meaning of the phrase as a whole when we seem to have cases that sometimes go with the literal meaning of individual words? I think these court cases overwhelmingly say, including some of the cases that arguably go the other way, a case like Bostock, for example, I think even Bostock recognizes that the ordinary meaning of the words govern. You can't use a specialized meaning or historical meaning to trump the plain language. If this were a conflict between there's only one reading and it says X, but we're coming in and using history and something else to say, oh, it really means Y, that wouldn't be permissible, but that's not what we're doing here. What we're doing is trying to find the ordinary meaning of the language, and what this court has said in cases like AT&T is that it's not an appropriate mode of statutory construction to take a phrase, chop it up into its constituent parts, get a dictionary, find the broadest possible dictionary definition of each word, and then glue it all together. That just doesn't work. That's not appropriate, and I think that's ultimately what Luxaire's interpretation is doing. Second question is, how would you define governmental in this context? And this gets really to both cases, but do you have a definition that we can use that would distinguish governmental from non-governmental? I would say, I guess what I would say for purposes of defining foreign tribunal I would say that the tribunal needs to be created by the government and exercising authority conferred by the government, and then let me just add one point. I don't think it's enough. I think the chief may have been alluding to this idea, and Luxaire alludes to it briefly when talking about the Fourth Circuit's approach. It's definitely not enough that there is a court at the end of the day that might be asked to enforce the award. I think that court involvement is not enough to governmentalize what everyone else would think of as a private arbitration, and there are a couple reasons for that. I think courts enforce private contracts all the time, and we all recognize that the contracts themselves remain private, so the fact that there's like judicial involvement doesn't kind of, you know, make it a public contract in any sort of meaningful way. I think secondly, on that, U.S. courts across the country have had to wrestle with the idea of whether arbitrators are state actors for constitutional purposes. Courts have uniformly rejected that idea. I think there are five circuits out there that have said arbitrators are not state actors. I think recognizing that arbitration really is something that's private. And then finally, I do think that having a judicial role is not enough to make an arbitration governmental, because the judicial role is so limited. Whether it's under the FAA or under Section 1059 of the German Civil Procedure Code, review of arbitrations when you're being asked to enforce an arbitration, enforce an arbitral judgment or award is extremely limited, and if a court comes in and sees an error of law, it can't correct it. And so, if a court doesn't have the ability to correct an error of law, it's not really judicial review, it's not really governmental involvement at all. One follow-up on that, sorry to prolong it. Do you look at whether the arbitrators themselves are government-appointed, government-paid, government-removable, or not at all? I think that those are factors that could bear on this. I do think that that is a legitimate... I don't think that that is the only test, like looking at where the paycheck comes from, because, frankly, there are all sorts of different arrangements, including, you know, some arrangements that we would say would fall within the category of, you know, intergovernmental arbitral tribunals that might sometimes use private adjudicators in the sense that they're not like government officials. Thank you. Justice Barrett. Thank you, Counsel. Mr. Bail? Mr. Chief Justice, and may it please the Court, the ad hoc arbitration initiated by the Fund is not a proceeding before an international tribunal, as that phrase is used in Section 1782. In order to constitute an international tribunal, the decision-maker must owe its existence and its powers to an international agreement between or among sovereign nations. Here, the treaty between Lithuania and Russia did not create the ad hoc arbitration panel, and it did not empower that panel to resolve investor disputes. The panel was created when the Fund, which is not a party to the treaty, elected to take up Lithuania's standing offer and consent to arbitrate with a potential class of unknown private investors. The resulting ad hoc panel of nongovernmental arbitrators, selected by the disputants as equal parties, was empowered by the parties' consent to arbitrate and not by the treaty. Do you have any questions, Your Honor? Sure. The... You're quite right that the panel is... private parties participate and not the countries themselves, but this seems to me as quite different, for example, from the case, the issue we were just talking about. You have two governments behind this whole enterprise. They, for their own particular reasons, have set up this mechanism. It's not a purely private undertaking or endeavor, and I think that sovereign character maybe suggests less support for the position that you're arguing for. I think, Your Honor, the statutory language is focusing not on whether it is such a proceeding, but it's whether it is an international tribunal. It's focusing on the decision maker itself. Now, in this case, and as you have said in other cases, let's start with the treaty. The treaty itself simply says and is designed to encourage people in Lithuania to invest in Russia and in Russia to invest in Lithuania, a fairly common occurrence. And how it achieves that is by giving an option to the investor to escape from the courts, to escape from a governmental adjudicator, to have a resolution that is shorn of governmental implication. You pick an ad hoc arbitration panel under private rules. Everyone selects the arbitrator as a regular arbitration. It is final and will be binding on the sovereign when you sue the sovereign or you arbitrate against the sovereign. You eschew courts. You're going nowhere near them. There isn't any appellate right. Indeed, it's final. So what this treaty is doing is it's assuring the investor that there will not be a governmental decision maker that's going to be involved in the outcome. You can go and avoid home court advantage. Now that's the opposite. I'm having a very hard time understanding that distinction. International tribunals generally want to select neutral judges that are not an individual state's decision, but a combined decision by an adjudicatory body that it considers neutral. Now, I'm not going to define neutrality for them, but virtually all I know of them, most of them don't even require judges. They let the states pick whatever judges they want with whatever background they want, and they even often permit those bodies to decide the procedural rules. So I don't understand the emphasis on a state adjudicator. Now, if you're talking about selection of the adjudicator, which is what I think you mean. Yes. All right. Lithuania picked one of the Lithuanians, correct? Yes. What's the difference between it doing it directly and the investor state saying, I'm going to give my agency to the investor? I can pick any adjudicator I want in the world. Why is it wrong for me to say I'm going to have my secretary of state do it, or I'm going to have an individual do it? The reason I ask this question is because I think, and that's what I wanted to respond to, that the issue is one of the treaty, that it is an agreement between two sovereign nations to submit a dispute that could involve both of them in an adjudicatory body that they have created. And I don't see it. That's my definition. How do you say this doesn't fit that definition? There's a lot there to unpack, Your Honor, and I will try to address each part of it. Let's start with the notion of neutrality. I'm not talking about neutrality. I'm talking about non-governmental. So I'm an investor. I'm a Russian national. I invest in Lithuania. If Lithuania expropriates my investment, do I want to go to a Lithuanian court? It's governmental. I'm not suggesting that that court is necessarily biased, but it's a home field. Would I want to be disputing something with Lithuania before a Lithuania judiciary, even if they are honest and impartial? It is non-governmental. It is telling, the two countries are telling investors, you will not be burdened by our courts if you don't want to do it. Now, I don't think the treaty, so that's the difference. I'm not saying neutrality. I'm saying non-governmental. When the parties then select the arbitrators, it looks just like any other arbitration. Lithuania is the respondent in that case. They pick one arbitrator. They don't have control over the outcome. The other arbitrator is selected by the individual, and they must collectively pick someone else. There is no governmental role other than the government is a party, and has agreed to follow private arbitration rules, and continue. Give me your definition of what constitutes an international tribunal. Define it for me. It can't be the decision maker. It is a decision maker that owes both its existence and its powers to an international agreement between or among sovereigns. And that does not happen here. The tribunal doesn't exist, or the decision maker doesn't exist. This treaty was passed in 2004. Now, it could have created an entity that would resolve disputes. It could make it governmental. They could appoint governmental agents to do that. That was not done here. They specifically give four alternatives that the claimant gets to pick to escape any governmental review in the decision making. And I think the statute is referring to the decision maker. Not its origin, not whether there is a state that's involved anywhere as a party. It's tribunal focused. It's the deliberative body itself. Is it a private adjudicator? Now, Justice Breyer asked the question of, well, what happens if we go the other way? Particularly on what I'll call the... Thank you. You're turning to his question. No, I'm sorry, Your Honor. I may not have finished. No, you finished. Okay. Thank you, Your Honor. I hope I'm not finished, but I completed my answer. Justice Breyer, the parade of horribles, I'm not going to go down that road, but what does it mean if a tribunal is any decision maker? If you go that broadly or an international tribunal is anything outside or foreign that is outside the United States? Think of the number of decision makers that there are out there, and we use the example of the ersatz television judges who decide disputes. That is actually an arbitration. Those people sign an arbitration agreement. The adjudicator wears a robe, stands up on TV, and makes a decision. Is the United States, which does not favor broad discovery in arbitrations under the FAA, going to recognize that if there is the German equivalent of Judge Judy, that they will be entitled? You don't have to do that. That's the dissent of the intel. You have a narrow definition of tribunal, and it seems to me you're swept up once we say, if we say, that private arbitrations are part of this. Oh, yes.  that I'm not an expert in this, but the restatement says we should. We should what, Your Honor? That we should say that private tribunals are. I mean, that's at least our Berman's brief. You know, I read that, and they say the restatement is against you and against your side on this. But the restatement, that is simply nomenclature. We're talking about a statute that extends to foreign litigants the opportunity to come to the United States and seek discovery from United States citizens. Once you move into the arbitration forum, you have now, that is the foreign entity, you've created a wonderful incentive for me as a litigator to start the arbitration outside the United States if I can, and then say it's an external arbitration, and then have at the courts for discovery. No, you can't if you follow, if you add Intel and, you know, the Japanese tribunal and the others saying, of course, that's a problem what you say. Yes. And so what we have to do is say that this discovery here takes place if and only if the foreign tribunal says it wants it. Well, that didn't happen here, Your Honor, right? The foreign tribunal... It might not have happened there because it's a broad problem that I'm worried about. And I have the government on the one side. Sounds like the restatement is on the other side. There are a lot of real experts on this or on the other side. And I'm having trouble with this case. All right? There certainly is... And therefore, the things that you say, I can think of matching problems no matter what. If we go against, if we take the first, you know, we say only applies to foreign governmental things, only governmental. Hey, you produced a wonderful example of that, of whether it is or isn't. Yes. And we'll have to decide cases like that. Yes. And I think that, frankly, Your Honor, mine is fairly easy just because of what... I know you think yours is easy and yours want to win. But what I want you to do is figure out what kind of opinion to write and how to decide. I understand. So I'm putting you in my dilemma. Yes. Which is restatement, the experts over here, a lot of them, including the Japanese tribunal. Government over here, you claim, my God, this will be a mess. Fourteen briefs say, here's what you do to stop the mess. Yes. They won't stop it totally. No, it won't stop it totally. There's no doubt about it. Your Honor, but if you look at a statute that moved from courts to foreign or international tribunals, has an enacting statute beforehand that told the commission, look at quasi-judicial agencies when you are deciding how to broaden this. There's no easy one-shot answer, but the difference between the two definitions, one of them being circumscribed in what I think is a reasonable way, that will be for you justices to determine, but I think that that works as opposed to the opposite, which is any outside United States decision-maker. If an orchestra decides that they want a national orchestra, decides that it wants to have a particular audition for violinists, and they all vote, that is a decision-making. It might even be by a governmental entity, but it is certainly not a tribunal that was created by, in my case, two sovereigns acting together and deciding, here is the instrument, here is the vehicle that will resolve the case. They did not do that here, and I think you can carve out those. Can you come up with a completely outcome-determinative answer? I don't know, but you certainly can with what's before you. I believe you're on. Thank you, counsel. Justice Alito, further? Justice Sotomayor? The W, the World Trade Organization, is made up of foreign states, and it has a dispute settlement plan between the states. The states can petition the WTO, it picks the arbitrators, and the states can then adjudicate their dispute between them. That would be an international tribunal? It depends, Your Honor. I'm sorry, I don't... It depends on whether they are selecting as the parties, the disputants, they are selecting the arbitrators. If they're doing it in that fashion... I'm sorry, I don't understand. The fact that the WTO selects the arbitrators makes a difference for you? Yes, if the individual disputants are selecting an arbitration panel that is basically made up of private individuals, if the WHO is not establishing, creating a standing body that will be resolving these disputes, you do not have an international tribunal. All right. Tell me why? The WTO is a World International State Agency. Yes. They create a dispute settlement body that says the states can come to it and say, we want you, the WHO, to settle this dispute between us. WTO picks the arbitrable panel and the states submit to its jurisdiction. That's not an international... No, that would be, as you described it, and I apologize, I misunderstood you, Your Honor, that sounds like it was an entity that was created by two or more sovereigns acting through the WHO. So, yes, in that case, the entity is established by the governments, by the treaty. Nothing is established by this treaty. So just in that vein, I mean, suppose there's a treaty and it's between two countries and it's to resolve disputes between those two countries. But they don't want to set up any kind of standing organization. Instead, they want to use arbitrators. And the arbitrators, there'll be one set for Dispute 1 and another set for Dispute 2. All right, but the treaty just says we're going to go to arbitration to resolve any differences between them. Is the eventual arbitral panel an international tribunal? That is it. That's a situation where it's state-to-state. It is state-to-state. It's meant to be essentially this case, but state-to-state. Right. Or is it more like I'm alone? That series of cases or the mixed German... Well, now you're going above my knowledge. So let's stick to my hypothetical. If it is two countries coming together or more than two countries creating... It's a treaty and they create a system of arbitration. Yes. That could be, depending on whether the tribunal itself, it's selected by the states, that is the states themselves... Yeah, eventually when a dispute arises, then the states pick arbitrators in the normal fashion that private parties pick arbitrators. I think that the court could find that that is not an international tribunal because the decision-maker itself was not created by the act of the sovereigns and it was not empowered by them. That is the specific tribunal. It is a much closer case. So it's a much closer case because it's state-to-state? Because state-to-state. I mean, it involves... I guess one question then would be why is state-to-state so different from investor-state when states used to represent investors directly and now they don't. This is a better system. Why should that difference matter? But if you think, as you said at the end, that my system also is not an international tribunal, then I guess I want to ask you another question about why that should be because then you're saying, well, a standing body that they set up would be an international tribunal. But if they set up a standing system under which they pick arbitrators as disputes arise, that doesn't count as an international tribunal. And I guess I wonder why that should be. I said, and I apologize, Your Honor, I said it could. You have to come out one way or the other. Helpful. But no, I think that it depends upon the nature of the decision-maker. And here you could say the decision-maker ultimately is being selected by sovereigns and only sovereigns. That is not our case. That is not a case where they are yielding to a common citizen and giving up the opportunity to have their own courts review it. So I think that it is different. I think it's different from when our treaty, which simply is an agreement to arbitrate if the claimant chooses it. That's not what you are describing. And you are describing the establishment of a deliberative body by the governments themselves eventually. That's not what we have in our case. So I think you could conclude, yes, that is an international tribunal. Without disturbing my analysis, I hope. Justice Gorsuch? In this vein, it seems like one thing we do know is that in 1964 the Rules Committee was trying to capture entities like the U.S.-German Mixed Claims Commission and the U.S.-Canada Arbitration. Why do those fall on the side of the line of being foreign tribunals on your account? Those were state-to-state disputes. And the treaty or the commission or the document that was involved created an entity. And in both of those cases, the adjudicators are government officials, usually from both countries. That is richly governmental. That is certainly created by the international interchange between the countries. And it is staffed with government officials, usually from both sides. And it has sort of a diplomatic side to it. But that is entirely different. And that fits within, I think, the definition that I'm offering the Court, which is, is the decision-maker basically created by the two governmental entities and is it exercising the power of those two entities? And in the case of I'm Alone and in the case of the German Mixed Claims Commission,  Of course, the German Mixed Claims Commission was together for 17 years, decided over 1,000 disputes between the countries. So that's a very different animal. And I don't think anyone would say that that is not an international... those are not international tribunals. Justice Kavanaugh? Just so I'm clear on your answer to Justice Kagan's question, if we were to rule for you here, I understood you to say you could distinguish the state-to-state situation based on some differences there, or, alternatively, perhaps the principle that you would win on here would apply in the state-to-state situation, but we don't have to answer that question one way or the other in this case. I think that's correct, Your Honor. Okay. Second, the question I asked Mr. Martinez as well, for the arbitrators themselves, of what significance is it who appoints them, who pays them, and who can remove them? Well, I think if the body is established by the treaty and it is staffed with government employees, let's say Russia and Lithuania, and they are agents of the two countries, I think then you start to have an international tribunal. I think that's different. Thank you. Justice Barrett? Thank you, Counsel. Thank you, Your Honor. Thank you, Justice. Ms. Kneedler? Mr. Chief Justice, and may it please the Court, Section 1782 was enacted as part of a 1964 law specifically designed to promote comity with other governments by improving existing practices of judicial assistance in litigation. Arbitration is an alternative to litigation. It is not a form of litigation. Section 1782 accordingly applies to requests for evidence from courts or other adjudicatory bodies established by the government and exercising official authority conferred by government. But Section 1782 does not authorize the obtaining of evidence for a panel of private arbitrators assembled pursuant to an agreement between parties to a dispute.  in a contract between two private parties to arbitrate or when a private investor takes up the offer by a government to arbitrate a dispute rather than going to court and litigating it. This government focus is strongly supported by the text of 1782 and we think the most natural reading is of the term foreign or international tribunal, having a governmental character. And we think that's particularly true in an act of Congress that was passed to improve methods of cooperation in litigation with other countries. It's used in a formal legal sense in that way. Arbitration is handled separately, for example, under the United States Code in Title IX and enforcement of arbitration are handled separately. Other provisions of the 1964 Act reinforce this conclusion even further as explained in the brief, 1781, 1782, and 1696. But I particularly want to focus on the background of this. Before you do that, Mr. Kneedler, you are supporting two very different petitioners or at least with quite distinct status. And I wonder if you could spend a couple moments talking about that, how you representing the government looks at the differences between the two entities. Well, there are certain differences but I think fundamentally they are the same because in the private arbitration situation, it's private arbitrators who are assembled because the parties have agreed to arbitrate and they select the arbitrators. That is exactly what is happening in the investor state situation. All the treaty does is obligate each party to offer to arbitrate. It's the investor who takes up the offer and it's only then that the agreement to arbitrate is made. I would have thought you, given your obligations representing the United States in the international sphere, might regard the second case as distinct in the sense that this isn't General Motors and Volvo or whoever coming to set up something just happens to be overseas, but it's two sovereign nations coming together. And I would have thought that might have made a significant difference to the State Department. It does not. We view the investor state situation for these purposes to be just like the private arbitration because it functions just like the private arbitration. There is a standing offer to arbitrate from the government and if the private investor accepts that offer, there is an agreement to arbitrate formed. At that point, the foreign government is stepping out of its governmental role just like when a sovereign way of sovereign immunity is becoming a private person or just like a private person. And as I said, 1782, just like the whole 1964 Act, was enacted to further comedy with other governments. This has the potential to undermine that by putting U.S. courts, intruding them into arbitrations involving foreign governments or private parties anywhere in the world. What if the arbitrators were selected by the governments? In other words, and it was a standing entity. This is the body of arbitrators selected by Lithuania and Russia to decide disputes under this agreement. That might well be different. And I think it's important to understand the background of the term international tribunal in 1782. The foreign tribunal deals with individual foreign states and we think those tribunals are governmental because the predecessor to 1782 for foreign states was clearly limited to courts and slightly expanded here to include other things like courts. For international tribunals, that phrase is picked up directly from the predecessor statutes that we have in our brief, Section 270. And those statutes were enacted to deal with two specific international arbitrations that were, excuse me, international tribunals that were mentioned by counsel. One is the treaty with Great Britain involving a dispute over the sinking of a vessel and the other, the Mixed Claim Commission. Now, the Mixed Claim Commission might be closer to what you're describing. And there, there was an agreement between Germany and the United States to form what was an official governmental or intergovernmental body. It was established by them. They appointed the... The two governments appointed the members of the panel and it was exercising the combined governmental power of those two entities. And there were some problems with the way those two entities operated in terms of their getting evidence. Congress passed statutes in 1930 and 1933, which were codified in 270, as we explained, in an effort to try to enable those bodies to get evidence by authorizing them to administer oaths, to issue subpoenas, which are clearly governmental things. 1782 comes along and what Congress did was picking up on that same phrase, international tribunal, put it in 1782, but eliminated some of the limitations on the operation of those predecessor statutes, which were limited to situations in which the United States was a party to the dispute. The Rules Commission explained that why should it be limited in that way? And they said they wanted to put it on the same footing as the foreign government tribunals, but they're foreign governmental establishments, but they shouldn't be limited, and so they shouldn't be limited to cases in which the United States is a party or the United States would get evidence for itself. So it wanted to remove those limitations, but it didn't change the term international tribunal, which in those prior statutes was unquestionably limited to governmental bodies issuing subpoenas and administering oaths. Mr. Kneeder, can I ask you about the purpose of this statute and how it figures here? I mean, as I understand it, this is a statute that's designed to advance international comedy, and I think of all the parties here, you were the expert in international comedy. So I guess just to go back to the Chief Justice's question about why you picked this position, you know, putting the legal arguments to the side and focusing more on the arguments about how this advances or doesn't, the purpose of the statute to advance international comedy and the role of the United States with respect to foreign nations, essentially, like, what does the State Department say about this question? Well, the position of the State Department in the United States... Right, I'm asking why. Yeah, no, no. Well, I mean, first of all, we think it's compelled by the statute and what it was driving at, which is comedy with other nations, which is what the State Department was doing and what Congress was doing. Arbitration is something very different, and we recognize that when Congress has addressed the question of getting evidence in arbitration in Section 7 of the Federal Arbitration Act, that applies only domestically. Only the arbitrator can request information. There's no pretrial discovery. It's limited to the place where the arbitrator sits. What is proposed here has none of those limitations. It could be discovery about any dispute anywhere in the world between a government and an investor that the United States government has no responsibility for. And so the United States would be reluctant, I think, to endorse a system in which our courts could intrude into that foreign system and say you can get discovery in the United States in aid of that when that sort of thing is not available anywhere. Suppose we said you can't. Pardon me? Suppose we said you can't. I have the same question Justice Kagan had. Why? I mean, these briefs talk about England. They talk about Spain. They talk about France. And a lot of them say, the Japanese tribunal, I think particularly, say that this can't be used in these situations anyway unless the arbitrator wants. And that makes it coherent and consistent with local arbitration. And that would in turn involve the United States court, as was true in the Alex Parker's case here, an extensive undertaking to say what would. But that's the lead. Is that what is driving? Is it that, that they're worried that the court won't be able to say whether a tribunal in some other country did or did not, and say send us a letter? I mean, I can think of many ways around that. But is that what my question is really, Justice Kagan? Why? What is it that the state department. I understand the practicality in a particular case. But I think the points that I'm raising that have been raised by others raise important policy questions that are for Congress to decide. Again, the Federal Arbitration Act is where Congress has addressed arbitration. It is provided for the acquisition of evidence only for domestic arbitrations and in very limited ways. And before that is extended elsewhere, that raises serious questions that the State Department, the United States government would want to focus on. Should it be limited to situations where the arbitrator's already appointed? What limitations should be placed on it? Should there be no pretrial discovery? There are all sorts of issues that would have to be addressed. And also, if the United States accepts this sort of, United States courts do this, they're not getting anything by way of comity in return. There's no such thing as comity with a foreign arbitration panel established by the agreement of two parties, whether they're even when it's an investor in a foreign state. There's no comity relationship that is being served here. If anything, there's the potential for friction and undermining it. Because states have agreed to enter into the, there are now 2,000 bits in the world. States have offered to enter into these to simplify the procedure for resolving these disputes and using arbitration in the same way a private party does and to depoliticize and take out of the diplomatic circle these disputes. But if you have a US court engaged in discovery, it creates the potential for controversy and for having the United States involved that is in something that's really none of its business. And that's very different from the relationship with courts in another country or formal international tribunals that was mentioned here. Because there, part of what the United States was trying to do was to encourage other governments to do something in a reciprocal way. The 1964 Act actually addresses this. It wants to improve the methods of facilitation in litigation in judicial assistance and encourage others to do that as well. My problem with what you're saying is 1782 itself assumes that the order the district court gives may prescribe the practices and procedure for discovery taking into account what the international tribunal will do. So going back to Justice Breyer's question, the international, we could say, or a court looking at this really should see what the international tribunal wants because it's required to take that into consideration. And I would assume it would be an abuse of discretion to go much further without a compelling reason. But putting that aside, you've already said that you agree that international tribunal was intended to cover the US-Germany state-to-state investment settlement mechanism and the US-Canada one. Those were created by treaty of the parties, between the parties. Each of them gave up their sovereignty to, well, they didn't give up their sovereignty, but they agreed to permit suits against each other, by each other, and to settle what was essentially private disputes in a representative capacity. I am still having a very hard time understanding how your position is not stepping on issues of foreign relations by stopping states from creating dispute resolution mechanisms involving its sovereign powers. I'm having a hard time. What you're basically saying is you can't, you have to undergo the expense of creating, of funding an independent body, having it do a hundred things at a time, or even maybe one, but you have to go through that expense because that formality is important to us. I don't understand that. It's not just the formality, it's the fact that it is, it's not an abdication of sovereign authority in that, in the state-to-state situation, it's an expression of sovereign authority, and that sovereign governmental authority is... Well, that's what a treaty is. A treaty is an expression of state sovereignty that says, investors can't sue me. I'm going to give up that sovereign right. Your investors, my friend, on the other side of the continent, your investors can sue me, but only in this way. Well, I mean, first of all, they're not suing, and I think that's a very important distinction. Arbitration is an alternative to invocation of the judicial process, and 1782 originally referred only to courts, and it was slightly expanded in 1964 to say, courts and other quasi-judicial entities. It's clear that with respect to foreign governments, I mean, foreign courts, that 1782 is talking about governmental bodies, and the commission's report incorporated into the Senate report makes clear that Congress wanted to do the same thing and put them on the same footing as foreign courts or foreign tribunals, and it's clear that they were picking up on the international tribunal as used in a very specialized way with respect to the two tribunals that you are mentioning. In both of those situations, the tribunal was formally and officially created by the sovereigns themselves, not by some private agreement, and also they were exercising official power. Power is something that's sovereign. It's an administration of justice, to use the term and the definition of courts that we think is central here. A private arbitral panel is not administering justice. It's trying to divine the intent of two parties to an agreement, which is very difficult. Thank you, Mr. Baird. Justice Breyer, anything further? Justice Alito? Justice Kagan? Justice Gorsuch? Mr. Kneedler, help me write two paragraphs of this opinion. First, the paragraph that distinguishes the arbitration agreement in the second case involving Lithuania from the U.S.-Canada and German claims tribunal. That's the first paragraph. Okay, with respect to that, the distinction is that in the, I think you said the United States-Canada agreement, that was a body established by the, directly established by the two governments, and they were exercising official power conferred by those two governments. The arbitration in the Alex Partners case has neither of those characteristics. Lithuania, like Russia, made an offer to arbitrate if the investor chooses. When the investor takes the state up on that, that there forms an agreement to arbitrate. It's not the treaty. It's the agreement the states offer the private investors' acceptance of it. I think that's reflected in this court's decision in BG Group about another BIT treaty. So the one is, the body, which is what the test looks at under 1782, is private. It's private arbitrators selected pursuant to an agreement. It's not governmental. One second, one paragraph on how you define a foreign or international tribunal. I think it's encapsulated with what I said before. The tribunal has to be established by the government and has to be exercising governmental authority, administering justice in the way we think of governmental courts, or quasi-judicial bodies, which is all that Congress intended to pick up and that it did pick up in the 1964 Act. Organs of government, and that we think is a foreign tribunal and the same principle applies in international tribunal, which was the form of tribunal that Congress picked up. It's also important to recognize, for example, 1782 and the rest of the 1964 Act use the term letter rogatory, which is something only courts issue. And things like that are scattered throughout the 1964 Act. References to tribunal officer or agency, which has a governmental character. Rules of practice of a foreign government, which is suggesting, or the tribunal, which is suggesting standing bodies having their own rules. So the statute and its history and its precursors are all pervasively imbued with a governmental character. It's hard to come away with reading these statutes, their background, the reports, explaining what the commission was up to without saying these are governmental and there's not a mention of arbitration there, which I said has always been treated differently. Thank you. Justice Kavanaugh? As been noted, Mr. Kneedler, you know the foreign relations implications and undoubtedly have consulted with the State Department at length on this. So I just want you to tie up. Ruling for the respondent in the investor state case, the second case, would cause problems for comedy and U.S. foreign relations because? Well, you know, I can't be specific about it. I mean, the main point I'm making is that international comedy is with foreign governments and this isn't that. And the United States gets nothing in return in comedy by opening its courts to do this. It exposes U.S. litigants, but another litigant who's in a foreign country would not be exposed to the same sort of thing. And so when it comes to international comedy, often what the United States wants to do is to do something reciprocal, to adopt something and hope other countries will do it, which is what the 1964 Act was about. But opening up U.S. courts unilaterally to this sort of discovery that has never been permitted, even in domestic arbitration, is a unilateral act with an ad hoc panel somewhere around the world that could upset a foreign government with no benefit comedy interchange for the United States. And it's not true that the foreign countries with whom the United States has entered into the treaty would expect this in any way. Is that correct? Well, I think that's also part of it. I mean, you know, maybe one would, but there's no reason to think that they would or, frankly, that they should. And before we enter into that sort of thing, it seems to me it's not just a question of treaties, but we're talking about judicial procedure, and it's something that Congress can weigh the various policies, as I mentioned, should there be conditions on the acquisition of evidence. What should the timing be? Are there certain types of foreign bits that should be accepted and not others? And I think the State Department would want to, we all would want to weigh in on the particulars of how that should happen, rather than reading this into a 1964 statute that there's no indication had anything to do with arbitration. The United States had not even ratified the New York Convention on International Commercial Arbitration in 1964 when this was enacted. You alluded to this earlier, I think, but I want to make sure I'm clear, that you think it could cause a problem if the U.S. court were resolving discovery disputes, including the second case, because a foreign state would be a party in that, and that could create problems, but I just want you to spell that out. I'm not saying that every... I'm making sort of a more general point. I'm not saying that any one dispute would be a problem. I'm not saying in this particular case. What I am saying is that the situation is in sync with that potential, and there's nothing in the statute that controls it, and it would be this court in Intel declined to impose rules about when you can seek discovery and the timing and all of that, and so I think that would not be an appropriate solution here either before the gate is opened at all. I think there should be either an act of Congress or a treaty that is specifically addressed to arbitration rather than judicial assistance with courts. Thank you. Justice Barrett? I have one clarifying question. Justice Kagan asked you about what another country might expect, and I'm wondering whether the expectations of the countries factor into this calculus at all or what they might have intended in a treaty. Justice Sotomayor pointed out that if there's some formality involved, that might create more expense for the foreign countries, so what if they said we want this private, you know, there's some existing private arbitrator, and we're going to call this, however, for purposes of disputes arising under this agreement, the Lithuanian-Russian Tribunal. Could they, even though maybe the body otherwise doesn't have the kinds of characteristics that you're identifying, could they simply by designating it as such reflect an intent to designate a private body, private arbitrator, as one that exercises sort of governmental authority? I think that would be problematic, too. I mean, I think the formality, I mean, the question is what was Congress intending, and I think Congress had specifically in mind formality because the exercise of sovereign power is a formal power. You want it written in law. You want it regular. So the formality of saying we want to call this the Lithuanian-Russian Tribunal simply for this purpose, but it's an otherwise, it's a standing body that handles private disputes. That kind of formality wouldn't count. Well, you know, I'm not aware of a situation like that, and I think it would be prudent to, you know, reserve that because the characters, the central character of the bit here is one that is very common, and I think that's all the court needs to decide and should reserve that, and I think also should reserve the state-to-state question in situations that don't involve the kind of presentation of claims to a commission. There's a sort of litigation before a commission in that situation that may be different from a boundary dispute between states or things that are really sovereign, and those might be put to one side for another reason, but I think the touchstone ought to be the test that I suggested, which is a simple one. Was it established by government or governments, and is it exercising governmental power or the equivalent in the international format? Is it exercising official power on behalf of the two governments? And that should be the touchstone if there are questions about the interpretation of a particular agreement. If the foreign treaty you're describing was just trying to get around that or something, labeling it, I don't think that would count. I think they have to, if it's going to be governmental, they have to develop an establishment as government. Thank you, Counsel. Mr. Daly. Mr. Chief Justice, and may it please the Court. Congress has authorized assistance to foreign tribunals. The best, most natural interpretation of that broad phrase includes a foreign-seated commercial arbitral tribunal. A commercial arbitral tribunal is a tribunal because it's authorized to render an adjudication of the party's legal rights that is final unless it's set aside by a reviewing court. That's consistent with this Court's interpretation of tribunal in intel and with contemporaneous usage of tribunal to mean commercial arbitral tribunals. And a foreign-seated commercial arbitral tribunal is foreign because its legal domicile or its juridical home is in another jurisdiction. There is no basis to draw an arbitrary line at the tribunals of foreign countries. That limitation is not supported by the statutory language or context or by intel. Providing assistance to commercial arbitral tribunals seated in other countries promotes cross-border commercial arbitration and international comity. It allows foreign tribunals handling cross-border commercial disputes to make better-informed, evidence-based decisions, provides access to evidence that would otherwise be out of reach, and it encourages other countries in turn to reciprocate by assisting arbitral tribunals here and that in turn promotes this country's pro-arbitration policy. And the statute does this with a range of safeguards. Parties that don't want assistance can opt out by agreeing not to seek it. The arbitral institutions can prohibit or limit it through their rules. And we're talking here only about a grant of authority to entertain a request. As this case shows, nothing requires a district court to grant all of the assistance that's requested or any of this. I'll be pleased to answer the court's questions. Counsel, you just heard from the government's representative who made a number of representations about the government's views with relations to other governments around the world. Now, those are, of course, not determinative, but I wonder if you have a response to those concerns. Mr. Chief Justice, the government and the petitioners are taking an awfully narrow view of comity. This court in Mitsubishi Motors and in SSHRC in the course of enforcing arbitration agreements noted that arbitration does promote international comity in the international commerce states. And so it really is a very narrow view that they are taking. As I've said, it really does promote comity. It does encourage other countries to assist tribunals here. And I know that my friend was dismissive of the number of countries that have in fact reciprocated, but the countries that have are major arbitral centers. It's the United Kingdom, it's France, it's Sweden, it's Switzerland. So there is some evidence that the reciprocation, the comity has actually happened. Counselor, I think the concern was in addition to what you've described  question of Congress' prerogatives here and the political branch's prerogatives in this area, the State Department, other branches, parts of the executive branch. In 1964, foreign tribunal and international tribunal brought evidence that it was a court or something very much like a court. And that arbitration on the scale that we're talking about today was unknown. And that maybe we could rejigger the intel factors to say you've got to ask the arbitrator first and he's got to agree. There's a lot of workarounds that we could patch up, I suppose. That's the argument I understand you'd be making. But that the government's position is, well, maybe you would like to be heard on some of these things in a legislative process. And that 1782 is itself a product of legislation and the court's jurisdiction in these matters, especially involving foreign, international questions, questions of comity, are usually resolved by the political branches rather than by this one. So I took that to be the thrust of Mr. Kneedler's presentation. Could you address that? There was a process leading up to the 1964 statute. This statute Of course. Again, I hate to repeat myself, but in 1964, I don't think anybody thought Congress was contemplating the world in which we live today with respect to international arbitration. And so, again, if that's true, take that premise, you may contest it, but just accept it for purposes of the question that I think there's a lot of evidence in this statute. Letters, regulatory processes and procedures, what is it, 1965, sorry, 1696, 1781, those provisions, a lot of evidence are talking about courts. And to the extent we're going to start invoking comity, shouldn't this court be hesitant to step into that kind of international breach? No. Congress has already enacted a statute that covers foreign tribunals, including foreign seated commercial arbitral tribunals. Again, I'm going to ask you one more time. Assume that that's really, you know, not as clear as you think it is. Why shouldn't I err in the other direction of allowing the political branches to address this question first? It sounds as though the political branches want to be heard in respect of a potential amendment to the statutes. I think that may be appropriate. If there are unforeseen applications of the I understand you contest the premise of the question. To address the question about the fact that there is no basis to limit this statute to the tribunals of foreign countries, that's not something that's supported by contemporaneous usage. And in fact, it's not supported by Intel either. In Intel, the tribunal was a tribunal because it had a quasi judicial adjudicative function. The court referred to its authority to determine liability, a disposition that will be final unless overturned by a reviewing court. And it's significant that in Intel, the government urged the court to rule on the basis that that was the nature. It's at page 16 of the government's amicus brief in Intel. The court clearly paid close attention to the government's amicus brief in Intel, but did not accept that basis for ruling. And really to go back to the legislative history, we don't think the court needs to look at the legislative history. We think that in context, the text of the statute is clear enough, and so there is no need. I'm still with Justice Gorsuch's question. I don't want to rephrase it because I think he phrased it exactly right. Assume I don't agree with you. I do not believe that this statute is so clear in its history and language. And I worry because there are lots of problems once you go to arbitration for private commercial arbitration. Company A wants to get a lot of information before there's even a proceeding started. Two, they want to get some information of a kind that the foreign proceeding wouldn't want to get. It can't under that law. Three, four, five, they're all listed. And now I understand the government's view. Too many problems extending this. There are only two circuits that have done it, and maybe I don't know about what the restatement said. I haven't read it. But go to Congress. Now we're not asking people who are penniless and have no influence to go to Congress. We are asking major companies in the United States and abroad who use this system. Commercial arbitration. Go to Congress and get it worked out. Now that I think I learned, whether he intended to say it or not, I think he did, from the government. And so don't we want to know what you think about that? The issues that have been identified can all be addressed within the statute encompassing these types of tribunals. There was a reference to the difficulty caused when evidence assistance is sought before an arbitration has begun. Well, the statute we know already encompasses that because Intel said the proceeding only has to be in contemplation. For future cases, there could be a rule that the statute now includes a requirement to exercise caution before the tribunal has been constituted. Perhaps you only grant assistance if there are some kind of exceptional circumstances. So all of those concerns can be addressed within the structure of the statute that we already have. I think the question we're presenting is that there are going to be a lot of these questions. Aren't there? I mean, you write 1782. You don't require proceedings. They don't have to exist. Arbitration? We contemplate how close in time do we have to expect this arbitration to exist? How many of the arbitrators have to agree or maybe they don't? It runs very counter to our intuitions about arbitration, which is that it's supposed to be quick, it's supposed to be governed by an arbitrator. We're not supposed to have U.S.-style discovery. And 1782 is a very liberal grant of discovery. And yes, maybe we can devise a workaround. I don't doubt it. I mean, I'm quite confident Justice Breyer can come up with an excellent list of factors that I'd probably vote for if I were a legislator. But I guess the question is why should we be doing that? Why shouldn't you go to Congress? The answer to this is that we have a broad statute. And there was reference when my friend was arguing to the phrase foreign tribunal and it having a governmental limitation. Neither side has been able to point to usage of that term to mean what it is asking the court to rule now. We don't have an example of it being used to reference arbitral tribunals, and my friend doesn't have an example of it being used to reference courts and non-judicial adjudicated bodies of foreign countries. And that's not terribly surprising because Congress and this court wouldn't have had much reason prior to the 1970s to be talking about foreign commercial arbitral tribunals at all. And it's different from foreign leader or personal privacy. Those are phrases that based on usage have some linguistic resonance that's narrower than the ordinary meaning of their terms. And so what Congress has done is used a broad phrase that didn't then have a particular narrow meaning. And so there is really no basis to do anything other than apply the most natural meaning of the two words. Tribunal as interpreted in Intel to mean an adjudicated body that has the authority to make a final ruling subject only to court review and foreign. And we know that in the 1964 statute, Congress did not use the word foreign to mean foreign governmental. When Congress wanted to say foreign governmental in the 1964 statute in section 5 of it, it used the words of a foreign country. That's how it referenced the official documents of a foreign government. When it used the word foreign in section 2 of the same statute, it was referring only to things outside the United States, documents located overseas. And so putting these terms together, which is really all that we can do because there was no definition of the term as a phrase at that point, that covers foreign commercial arbitral tribunals. What you've just done in your presentation, of course, is take the two words and sever them and focus on one sort of one at a time and then treat those as constituents while your friend on the other side makes the point that you need to look at the phrase as a phrase. It's not what does a tribunal mean, what is foreign means. It's what is a foreign tribunal. Do you have any response to that? Mr. Chief Justice, neither side has been able to demonstrate a pre-existing understanding of the phrase foreign tribunal. My friend referenced the corpus linguistic study. The court should disregard that. That was self-published. It's full of gaps. It's full of typographical errors. Self-published three days before the reply brief was filed. It says that it was done by some coders. It doesn't tell us. It's inconsistent whether there were two or three coders. But ultimately, all it ends up doing is establishing that the phrase didn't really have a meaning as of 1964. They only were able to come up with a definition of tribunal. And so here, really, what the court can do is to look to the words that were used, tribunal as interpreted in Intel and as used at the time to mean commercial arbitral tribunal and foreign as used in the 1964 statute to mean outside the United States. I do accept that the 1958 statute that established the commission used the expression agencies, but that was not the expression that Congress used when it came to write the 1964 statute. It used a different phrase, foreign tribunal, presumably to mean something different. And my friend referenced the fact that for decades after the statute was enacted, it was understood that it didn't apply to foreign commercial tribunals. That's really not right. In the absence of commentary one way or the other on this really doesn't tell us that there was an understanding that it didn't apply to foreign commercial tribunals. In fact, there's little evidence that this statute was used by private litigants for much of anything prior to the 1990s. It may be that this statute just sort of passed into obscurity. That's what had happened with the 1855 statute that started this. And so little evidence that it was used for much of anything before the 1990s. If I could address some of the policy issues that were discussed during my friend's presentation, really this does support commercial arbitration and in the international commercial context the considerations are different than they are in purely domestic arbitrations. Evidence gathering discovery is not alien to foreign commercial arbitrations and this is all subject to the proviso that if the parties don't want it or the institutions don't want it, then they can prohibit it. And there was a reference in the government You mean on a case by case basis the arbitrators would prohibit it? Well, the parties could prohibit it in their arbitration agreements and the arbitration institutions could prohibit it in the rules that apply to all of the arbitrations that they perform. Thank you. There was a reference to the conflict or the asymmetry with Section 7 of the Federal Arbitration Act and to be sure there is an asymmetry because Section 1782 permits assistance to foreign tribunals that's not available for domestic arbitral proceedings or domestic judicial proceedings. Pre-filing discovery requests by interested non-parties. But I think that's explicable on two potential bases. One is the policy ground. I've talked about if Congress was trying to assist in the resolution of cross-border commercial disputes. It's not that Americans are targeted by Section 1782 requests. American businesses themselves are involved in foreign arbitral proceedings and therefore can use the assistance that it offers. I think the other potential explanation for this asymmetry is much more prosaic. We have three different regimes, assistance to foreign proceedings, assistance to domestic arbitral proceedings and domestic judicial proceedings all enacted separately decades apart with little evidence that Congress has ever really considered whether they fit together and if so, how. Thank you Counsel. Justice Breyer. Thank you, Counsel. Mr. Ganos. Thank you, Mr. Chief Justice and may it please the Court. I want to begin with since I'm last in the order with some of the questions that arose earlier today. I heard the United States say over and again that arbitration was not contemplated in Section 1782. I think that's just flat wrong. First of all, it's irrelevant in any event because as Justice Scalia in his concurrence in Intel pointed out and as this Court described in Bostock, what's important is what the language of the statute says, not what was intended in the minds of various Senate reports. But in any event, the Senate report and the House report contemporaneously emphasize the importance of that German Mixed Claims Commission to its desire to amend Section 1782 as it did. And I think it's worth recalling that the German Mixed Claims Commission set up a tribunal where each government appointed one commissioner and then the word used is an umpire as effectively the chair. That's an arbitration. That's plain and simple. So it can't be the case that no arbitrations were contemplated within the meaning of the concept of tribunal. And that was an international tribunal and ours is as well. And with that, I welcome the Court's questions. If there are none, I want to... Well, I'll begin with the same question I had for your friend. How do you react to the government's representations of the foreign policy impacts? Again, the decision on what the statute means is, of course, ours. But we do look to what the position of the United States is particularly when dealing with something that has an effect on foreign affairs. Absolutely. That's actually exactly where I was going to go. The first thing I would mention is that a number of sovereigns have invoked Section 1782 in connection with bilateral investment treaty disputes. Turkey, Ecuador, that's in our brief in one of the footnotes. So it's not only investors who've invoked Section 1782 to obtain third-party discovery. So comity should take that into account as well. And the other is that obviously the Mixed Claims Commission had no ability to reciprocate to the United States when it was coming to discovery. So comity is not purely a bilateral question. It's a question of respecting international tribunals created by sovereigns or imbued with authority by sovereigns and giving those tribunals respect and assisting them. And I should mention that the Mixed Claims Commission existed well beyond the German American Mixed Claims Commission. There were a number of forms involving foreign sovereigns like Mexico and France. And of course the U.S. was an innovator in this respect going all the way back to the Jay Treaty. But those were effectively disputes involving private property. Starting with the Jay Treaty, the whole point was that there were U.S. citizens whose property was damaged by the British forces and there were British subjects whose property was damaged by United States forces and this was an opportunity where there was a spousal of course for one government to represent those interests in a dispute. And that's exactly what's happening here except that we've cut out as I think it was just... The extent to which any proceeds would be resolved. I mean it was a case involving the state. The state was representing the individual and the property that the funds that were received by the state were then provided to the individual. And that's how the Mixed Claims Commission worked as well. I guess... Tell me again exactly what your reliance on the Jay Treaty and the original trial action is. I don't see that as a private entity. I don't see in what way it is distinct from simply a case. Well because in whether we're talking about the Jay Treaty or the Mixed Claims Commission each sovereign appointed a commissioner and then the two sovereigns jointly appointed an umpire. Those persons were not at the moment they were serving on this commission operating as a U.S. whether they were previously a U.S. judge or a judge from Great Britain or Germany. At the moment they were serving as commissioners or arbitrators or umpires. They were sitting in a completely different capacity. They were arbitrators. They were sitting in a dispute effectively private between two sovereigns. In our case the sovereign has appointed one arbitrator. The foreign investor has appointed the second arbitrator and the two jointly have appointed the chair but what's most important is that the arbitration could not, the arbitral tribunal could not exist without the impetus of the treaty both in terms of the offer to arbitrate but also the arbitration the law applicable to the dispute as the Chief Justice noted in the dissent in B.G. This is a fundamentally sovereign dispute. The sovereign is allowing a tribunal to sit in judgment of its legislation of its sovereign acts. Did it breach the treaty? Did it engage in expropriation without compensation? Did it treat an individual unfairly or inequitably? Did it fail to provide full protection and security? Let me see if I'm I mean I think I take your point to the Chief Justice that any account on the other side has to recognize the existence of these arbitrable panels between Canada and the Mixed Claims Commission of Germany but I also take the distinction that's being proffered by the other side of something like this that there it was state to state. Here there's a private party involved. There was some exercise of governmental authority. Those commissions could for example I think the U.S. Canada one could issue subpoenas Mr. Oaths. Here there's none of that and here additionally though there is a treaty as you point out between states. There's just no indication that in reaching those treaties they understood those states understood that they could be subjected themselves to full U.S. discovery and there's some indication that they thought they wouldn't be doing that by agreeing to arbitration which takes us back to in my mind again the kind of well if we're really not sure here what they signed up for or what this statute says shouldn't this be left to Congress? There's a lot there to unpack. I've had it. I look forward to it. The first thing I would remind the court is that this is third party discovery. This is not an end around discovery within the arbitration process. That doesn't work for me. I'm just putting my cards on the table. I understand it's third party discovery but boy I don't know anybody who represents a party who doesn't dread the scope of third party subpoena practice and the expense and the delay that's involved and again before we'd assume that foreign states have signed up for that in America shouldn't we be a little cautious? Well I appreciate the point although I would again remind you that sovereigns themselves have invoked 1782 in the US to obtain discovery from third parties as well but I think the broader point is that whether we're talking about criminal court proceedings in Spain or a bilateral investment treaty dispute in France in relation to a treaty signed by Russia and Lithuania nobody outside of the US signed up for a third party discovery dealing with those issues but Congress decided that it wanted to provide support to those foreign or international tribunals and that's what this I think that's where we need to put our focus and that's why I mentioned fundamentally whether we take it as a phrase international tribunal or we take the two constituent elements an international tribunal we know that the tribunal could be arbitral because the German Mixed Claims Commission was an arbitral tribunal so then the question is does the word international carry so much water that it says no, it can't possibly be an investment treaty arbitration tribunal, it has to only be a tribunal where the two sovereigns are involved and I just don't see that the word international can carry that kind of weight. Mr. Llanos, I agree with you that some international tribunals particularly those that prosecute individuals often don't involve the foreign states in the litigation so we have plenty of those around why they're international we can discuss I'd like you to go back to Justice Gorsuch's question the other side says there are important distinctions that take this away from those other forms of arbitration the first and not unimportantly is that the agreement doesn't create the arbitration mechanism the agreement has to be invoked by a private party or by the government so that's a big distinction in their mind others are that the parties are not resolving state to state disputes but private litigant disputes so there it's a private dispute not a government to government dispute so could you address those two differences? Yes. First of all to answer the second part of your question first I think it's highly important that this tribunal is deciding whether Lithuania breached its obligations to Russia it is a hybridized institution a bilateral investment treaty tribunal because it is at once public international law and private international law it's a dispute where there's been an offer required in a treaty and an acceptance provided by an individual but then the arbitral tribunal itself has to answer a very particular question the question is did Lithuania breach its obligations to Russia not that it breached its obligations to an individual like my client did it breach its obligations to Russia and the obligations are to Russia that it would not take citizens property without fair prompt and adequate compensation that it would treat them fairly equitably those are promises that Lithuania did not make to my client my client is not a party to the treaty it made that promise to Russia to the Russian Federation and so it is a fundamentally international dispute from that perspective and that's what I meant when I said that the law applicable is the law of the treaty the law between two sovereigns and then to come back to the first part of your questions which is yes it is true again that there was a private litigant that accepted the offer of arbitration in the treaty but again the first part is fundamental as well that the sovereign made the offer and the reason the sovereign made the offer is because it was required to do so in the context of reciprocal promises to between sovereigns if I may address one other point and this relates to the policy considerations this treaty and many many other treaties include language that says that the investor has the opportunity to decide we could have gone to the Lithuanian courts or we could have commenced an arbitration to resolve a dispute as to whether our property was expropriated and as was noted in the earlier colloquy 1782 does not require a proceeding to have been initiated in order to come to the US courts you can contemplate a proceeding so what would be the effect of saying that a bilateral investment treaty tribunal is not an international tribunal within the meaning of the statute litigants would simply bring their discovery applications sooner they would say well I haven't filed I have sent a trigger letter the trigger letter which is in my world the parlance of that is notice of a dispute under the treaty it doesn't have to accept a particular form of dispute resolution that can be done later so the litigant can say I have notified the state of the fact of a dispute but I haven't decided I may go to court I may go to arbitration so since the court option is clearly a foreign tribunal within the meaning of 1782 let's have my discovery now and then I'll we'd effectively only be forcing litigants to bring disputes earlier it would also be asymmetrical because the governments would not have the opportunity to make the same application so you wouldn't have Turkey or Lithuania or Ecuador seeking discovery so I think our result is much better from an international law standpoint counsel you generously cited my dissent in the BG group case I went to look back at it turns out that seven members of the court joined Justice Breyer's majority opinion what do I do with that oh well congratulations I mean does that affect the point for which you were citing the dissent no it I mean Justice Breyer argued that it was any less of a sovereign capacity that the agreements were being made in the treaty my point was only that I thought that the dissent more fundamentally described the nature of what is agreed in a bilateral investment treaty the majority opinion didn't really go into it in as great a detail but that wasn't of course what the fundamental issue was in the case although perhaps the dissent would have argued it was it was a very good dissent it's not good enough to join Justice Kennedy thought so but no one else Justice Breyer anything further Justice Kavanaugh thank you counsel thank you Mr. Martinez three quick points your honors first of all this case turns on the text and history of the key phrase and in particular the meaning of the entire phrase foreign tribunal or foreign international tribunal Luxair has conceded what I think was apparent from their briefs which is that they don't have any evidence any example of the phrase foreign tribunal the one that's used in the statute ever being used to cover private arbitrations they don't give us a dictionary example they don't give us a statute they don't give us a court decision a newspaper nothing and so instead what they do is they criticize our use of our statutory arguments they say we don't have an example either but that's not right we have the corpus linguistic study which if you want to look at it or not we think you should look at it my friend criticized the study in various ways we think you can judge for yourself there's a 283 page appendix that's appended to the study that lets you kind of check their work more importantly though it's just not true as my friend said that we have not cited a single example of anyone using the phrase foreign tribunal to go beyond courts to cover other types of quasi governmental entities the very best example of that is this exact statute this exact statute the rules commission itself said we're using the word foreign tribunal because we want to pick up quasi judicial agencies foreign administrative tribunals and investigating magistrates so this example I think refutes their case and in the absence of any example on their side I think we win sort of the plain text argument and I think that's true in both cases if you look at the text the surrounding context in the history I think we have the better reading second I just want to touch on the possible work around Justice Breyer suggested which is essentially allowing this kind of discovery only when the arbitrator says it's okay we don't think that's a workable solution for a couple reasons first of all Intel forecloses it because Intel contemplates that 1782 can be used pre arbitration so that's a categorical problem my friend on the other side says okay well you can essentially rewrite Intel by making it essentially a requirement I don't think this court is I don't think anyone's asked the court to rewrite Intel and that's not really presented or a good solution because of the Intel problem what would then happen Justice Breyer is that the parties would have to argue about what a hypothetical arbitrator if and when he's later appointed would do how that person might conceivably think about the possible use of 1782 evidence so they're going to be just guessing and they're not going to be guessing in a place where they're going to have a lot of guidance because in a lot of the arbitration contracts it doesn't specify this the rules governing discovery in a lot of those contracts and under the laws of countries it basically says the arbitrator gets to decide so they're going to be doing guess work and in a lot of cases courts are going to be guessing wrong or doing a lot of work and then it turns out that the arbitrator didn't want the information anyway it also doesn't solve the comity problem the fact that the United States would be an outlier because U.S. style discovery is so broad and 1782 is so easily abused to get evidence even evidence that's outside the United States so long as you have someone in the United States that you can go after to seek that evidence from what all this means is that the solution here is to go to Congress if Congress wants to fix this statute or tailor it in any of these ways that we ask you to reverse thank you counsel the case is submitted